May it please the court. This is a relatively simple case in many ways. In this particular matter, the client I represent, Usbaldo Padilla, and five others were charged with attempting to smuggle 101 grams of heroin into the North County Correctional Facility. The heroin was not successfully smuggled into jail, but was actually ended up being found in a woman's parked car. In all, in this case, there were 19 separate individuals who were charged with making phone calls, and Mr. Padilla did not testify at trial, nor did either or any of the other 18 individuals who were brought in as people who had information but were not called upon to testify. What we had in this case was a deputy by the name of Lopez who was assigned to gather intelligence at the North County Correctional Facility, and that included the recording of telephone calls. At the trial, he testified about recipient meaning when what he did in trying to attempt to obtain a conviction is to gather tapes of I think it was six or seven individuals that were actually played. Those tapes were not brought into court with, along with these potential witnesses, but rather only their tapes were played, which put us in a position where, as a defendant, Mr. Padilla was never able to confront or to cross-examine the people on these tapes that were just played. They, well, they were individuals who I believe were probably waiting for some sort of a trial themselves in other matters. I don't know whether they would have come in to testify if they had a pending case. It's unlikely that any attorney would allow their client to come in and be a witness when they subsequently could be held. That's probable, but isn't he in a different position from anyone else who has co-conspirators' statements admitted against him? Well, the only he was the only defendant. And the other people But the others were presumably co-conspirators, that was at least the government's position, yeah. Mr. Padilla did not testify during the trial, so there was in a way, no way that anyone knew what his voice sounded like, its timbre, what information might relate to something that would cause there to be sufficient evidence to find him guilty of the charge. So because he did not testify, the only testimony that came in was essentially the statements made by these witnesses, which were interpreted from Spanish into English by an individual who was a court interpreter. And the jury heard that. They didn't hear anything from my client who didn't testify. And then the question became one of what about voice analysis? These were questions that were addressed briefly in the brief. The government did not seek to obtain any sort of analysis of the voices that they heard or what conceivably could have been a voice involving my client, Mr. Padilla. But Counsel, wasn't there testimony by a detective that that voice did belong to Padilla? There was, well he testified to that effect, as far as I recall. Right, so he identified Padilla's voice. He did. In fact, he said that there were about 12 occasions on which he had Mr. Padilla come into his office. That is just incredibly unbelievable. Why would an individual, assuming that Mr. Padilla was going to be in a situation where he was dealing drugs or attempting to deal drugs at the facility, why would he have 12 separate meetings where he would go to see Deputy Lopez? It just makes no sense. The last thing he would want to do would be to have someone be able to identify what his voice was so that they could say this is what was being played on phones. And to do that 12 times, supposedly according to Deputy Lopez, and Deputy Lopez further said that he would see him around in the buildings. He would talk to him. It doesn't make a lot of sense. This is a person who was not wanting to talk to anybody, didn't talk to them, and now we get this position from Detective, or Officer Lopez, that what was happening was he knew him quite well, although he didn't feel any compunction about seeking a voice analysis. There obviously are words that are used in the drug trade. Some of them may be understandable. Some may be comprehensible to jurors. Others aren't. Those were presented. The issues that were addressed in part, and I'll try to be as brief as I can, these witnesses could have been produced by the government. They weren't. I've cited a couple of cases, one of them being the Urena case, which would be involving the argument that to the contrary, Padilla did not receive a fair trial. He should have had the opportunity to have access to more of the information that was presented in this case than just statements that he could not counter. I would ask that the Court consider giving Mr. Padilla another trial on the basis that he did not receive a fair trial and that he could not testify, nor could he cross-examine any witnesses who were not made available. Thank you. Thank you, Your Honor. May it please the Court, Terrence Mann on behalf of the United States. On appeal, the defendant is essentially making generalized challenges to three relatively well-established ways of introducing trial evidence. These aren't particular challenges to something that was done only at his trial. For example, these particular jail calls had a unique characteristic which required these witnesses to be brought in, or that there was something particular about the voice testimony here that was problematic, or the drug code testimony. Defendant is essentially making a full frontal assault on these categories of trial evidence, and I don't believe there's support for it in the law. With respect to the recordings themselves and the confrontation clause argument, Crawford, by its very language, provides that co-conspirator statements are not testimonial. Here, the defendant's own admissions, which he doesn't challenge because he cannot, as well as all of the evidence from the rumors about a woman who was bringing in drugs to all of the investigation that led to the ultimate seizure of the 101 grams of heroin, all established by a preponderance that conspiracy existed. The defendant and these other participants in the calls were members of it, and that the statements were made during and in furtherance of this conspiracy, which, by virtue of the 22 calls that issue here, really were within about a 30-day period. Well, do rumors establish anything? I mean, it may establish what motivated the agents, but beyond that, I don't know that they have any probative effect. Well, not on their own, Your Honor, but when combined with all of the other evidence that derived from it, one thing I would note is defendant's admissions, they're not just generalized statements. They are orders to his employees, essentially saying, I want the drugs packaged in this way. I want two balloons in one glove and two balloons in the second glove for insertion in female body cavities. And that's the exact same way that the drugs were found later. So we're not relying simply on these rumors, but on all of the evidence that was obtained. Now, with respect to what defendant is requesting here, I'm not sure it was even possible in this case. Counsel, I think, concedes that what defense lawyer would allow his or her client to show up and start testifying about all the wrongdoing that he or she did. Now, in this case, defendants Velez, Mendoza, and Prieto had already pleaded guilty and were awaiting sentencing. But Valerie Delgadillo, who is essentially the hub or the center of the conspiracy, she was still awaiting trial. So there's really no way she was going to show up and incriminate herself. And I think if we were to follow defendant's request, we'd be in an untenable position. We'd have to litigate all of these defendants. The court would essentially have to create a new regime. Would we suppress certain calls if a witness incriminated him or herself? Would it create an affirmative duty on the government then to go out and identify witnesses, such as the co-conspirator identified only as Blackie in the last call, Exhibit 22? I just think there are significant ramifications here, not the least of which is judicial resources. I understand that efficiency and economy of resources should be a secondary concern when someone's liberty is at stake. But I would just note that this type of trial, this three-day trial, could easily have turned into a two-week trial if we were litigating and cross-examining all these people. I'm not sure what would happen if this were a six- to eight-week trial or a two-month trial that we often see where there are hundreds of wiretap calls being played. This would have the potential to essentially blow up many criminal court dockets. I think defendants are essentially offering a pan-doors box and the court should decline to open it. With respect to voice testimony, and I just note, Judge Canby, your question about whether a defendant could have called them himself, he absolutely had the right to do that. Well, then, but you get right back to your statement that they're not going to come anyway. Well, that's true. That's true. But I'm just saying in terms of he wasn't necessarily prejudiced by the government's failure to do it. He could have at least made the attempt himself. And I would note, I guess this also ties into the defendant's other constitutional claims. Beyond the waiver arguments in the government's papers, I would note that there's no manifest injustice here like you see in the cases that defendants cite for his right to present a defense, the right to present a defense of opinions that are identified there. I'm specifically thinking of Holmes v. South Carolina and Crane v. Kentucky. In Holmes, that's one where South Carolina had an evidence rule that if there's any forensic evidence at all, you couldn't point the finger at a third party. So you couldn't bring in, obviously, exculpatory evidence. And in that case, it was the rape and murder of an 86-year-old woman, and the defendant had found another individual in that same neighborhood who had been identified near the scene the day of, and at least four different witnesses had said that that person had either admitted the crime or had not denied it, even jokingly saying, well, you know I like older women after this terrible rape and murder of this elderly woman. And that rule prevented that from coming in. That's not the kind of unfair result you have here. Crane v. Kentucky, similarly, I mean, it's right out of Hollywood. You have a 16-year-old boy with no connection to the robbery and murder at a liquor store who is scooped up by the police, and in the middle of the night, after initially denying it, hops to everything. Those types of cases, to some extent, shock the conscience. And you look at that and you say, this defendant isn't given his fair day in court. That's not what we have here. The defendant, beyond being able to subpoena witnesses, the defendant could have introduced, say, his own version of drug code, or he could have introduced his own evidence, whether on cross-examination, bringing in his own witnesses or his own experts. He was never prevented from doing that. Turning to the voice identification testimony. Counsel, I'm more concerned with the Freeman error. The district court here, when the witness who was a recipient witness started testifying as an expert witness, the district court failed to clearly delineate the person's role and in what capacity they were testifying in, contrary to what we've said in Freeman. How is that harmless? Your Honor, it's harmless based on, essentially, the overwhelming evidence tying the defendant to the seizure of narcotics. Starting from, as I've already noted, his statements about exactly how they should be packaged and his directions to his employees, the calls themselves tie defendants to co-conspirator Sergio Velez, to whom he literally hands the phone in custody, and it's ultimately Velez's mother who is caught with the drugs. At the end of the day, being able to decouple that testimony didn't really, did not make the difference as to whether the defendant would ultimately be convicted. I would note, Your Honor, that part of the reason why that, I don't believe that was done, I mean, initially it wasn't objected to by the defense, and so we don't believe the error was plain, but, I mean, if it had been objected to, I think they probably would have flagged the issue for us and we would have tried to make more of an effort to do it. But in viewing the evidence in this particular case, it was hard to really find a way to divide it up because of the nature of the deputy's testimony. Here, unlike cases like Freeman where there was a distinction between surveillance or interpreting coded language, here it was a matter of literally the investigation was the cause. And to try to pull apart which part is lay testimony and which part is expert testimony, I was concerned would unnecessarily confuse the jury. I'm thinking of, for example, Exhibit 13. It was starting in 67 in the Exhibits of Record, Exhibit 6. There are references to it and hard to steam, which are ambiguous terms, but then a few pages later, I believe the light is going on. May I finish my point? Yes. In Exhibit 13, but then when you get two or three pages later on pages 69 and 70, there's a discussion of this code where Valerie DelVivio and DeFener are going back and forth saying, but I need to get the perfect words. Oh, yeah, we're at the bookstore, 24 pages, 27 pages. That's code, and the first part's ambiguous language. So it was unclear to me how do you pull these apart when individual calls themselves include both the ambiguous terms that are the subject of lay testimony and the coded language that's the subject of expert testimony. I mean, if we're pulling them out of chronological order in a case like this where it seems to go point by point, explaining who has the drugs, dropped off the money, that sort of thing, I think the danger of confusing the jury is stark. Thank you, counsel. Thank you, Your Honor. Is there any need for rebuttal? Very, very briefly. In looking at what we have here with Deputy Lopez, we have what you would call ear witness identification. He was the one who listened to all of the tapes, basically discussed them with the jury in the case. There was really no way to impeach his testimony because he was claiming it was coming directly from these logs that were made involving the other individual defendants, three of whom apparently had already pled guilty. A couple, I guess, had not. And what I would ask is that the court consider that the fact is that we had to rely on a deputy being accurate, honest, truthful with what he said happened, and with what his definitions are of what happened during the course of the development of this particular case. And that one person is not sufficient to really be justified as somebody that the court should listen to, the need that we have here. And if I could only read my writing because it's so poor, I'd tell you what it was. But in any event, I would ask that the court grant my client a chance to have a new trial under fair circumstances in which he has an opportunity to confront witnesses against him. Thank you, Your Honor. The case will be submitted.
judges: Canby, Reinhardt, Wardlaw